## W. G. BRILEY v. G. D. OLDHAM.

No. 7477. Decided February 15, 1939.
Rehearing overruled March 15, 1939.
(124 S. W., 2d Series, 854.)

*Wilson, Randal & Kilpatrick,* of Lubbock, for plaintiff in error.

*Coffee & Coffee,* of Big Spring, for defendant in error.

MR. PRESIDING JUDGE HARVEY delivered the opinion of the Commission of Appeals, Section A.

This suit was instituted by G. D. Oldham against W. G. Briley for the cancellation of nine vendor's lien notes, (and a deed of trust securing the payment of same) aggregating the principal sum of $3909.26, executed by Oldham and payable to the Citizens National Bank of Abilene, Texas, hereinafter called "the bank" or the "Abilene bank." Cancellation of the vendor's lien is also sought. Briley holds the notes under assignment from the bank. Cancellation is sought on the ground that the notes arose from an alleged illegal transaction and are therefore void. Briley, in his answer to the suit, set up a cross action seeking recovery of the amount of the notes with foreclosure of the vendor's lien. The case was tried before a jury, but, at the conclusion of the testimony, the trial court instructed the jury to return a verdict in favor of Briley. The verdict was so returned and judgment was rendered accordingly. The Court of Civil Appeals reversed said judgment and remanded the cause for another trial. 118 S. W. (2d) 797. Briley has been granted the writ of error.

The evidence is mostly documentary. The only oral testimony contained in the record is that of Oldham and Briley respectively. On May 10, 1934, one A. E. Cozart executed a deed conveying to Oldham a section of land in Dawson County, which contains 640 acres. We shall call this section of land "Section 3." The consideration recited in the deed is the sum of $9829.26, payable as follows: (1) $1280.00 cash; (2) the assumption by Oldham of a debt of $4640.00 due the Federal Land Bank of Houston and the Land Bank Commissioner; (3) the execution of nine vendor's lien notes, (and the deed of trust) aggregating $3909.26, payable to the Abilene bank, same being the vendor's lien notes in controversy. Oldham executed said nine notes and same were afterwards assigned to Briley by the bank, the payee, "without recourse."

The circumstances leading up to the execution of said deed and notes are substantially as follows:

In October, 1933, the Abilene bank being the owner of several sections of land in Dawson County, including Section 3, employed Briley to find purchasers for said land. Briley pro-

cured A. E. Cozart as purchaser of Section 3, and on November 27, 1933, Cozart entered into a written contract with the bank to purchase said Section 3. Material provisions contained in the contract read as follows:

"The purchase price being $9600, payable as follows: $1500, the receipt of which is hereby acknowledged, and the said Cozart shall execute ten vendor's lien notes, each for $710, due one, two, three, four, five, six, seven, eight, nine and ten years from date, payable to the order of the Citizens National Bank of Abilene, reserving a vendor's lien on the above described land. The said A. E. Cozart agrees at his own expense to secure a loan of $8100 or less if approved by the seller, on the above described land, the proceeds of said loan to take up $8100 of the vendor's lien notes above described, the $8100 to be the last of the notes above mentioned. The seller agree to furnish an abstract of title and also warranty deed to the purchaser to be delivered to the party making the loan, for examination only, the same to be returned to the seller in case the loan is not procured, and if the loan is not procured this contract will be cancelled. * * *."

Contemporaneously with the making of this contract the bank signed and acknowledged a warranty deed to Cozart for Section 3 and delivered same to Cozart for the purpose of being used by him in procuring a loan on the land, as provided in the contract of sale. The deed recited a cash consideration of $2500, and the execution by Cozart of nine vendor's lien notes for $422.33 each and a tenth note for $4500.00. A first lien was reserved in the deed to secure the $4500.00 note, and a second lien was reserved to secure the other nine notes. At the same time Cozart executed and delivered to the bank the ten vendor's lien notes called for by the above deed, and also executed a deed to certain property in lieu of the cash consideration recited in said deed. Said notes and said deed so executed by Cozart were to be held in escrow pending the consummation of the sale transaction. Shortly afterward, Cozart made application to the Federal Land Bank of Houston and the Land Bank Commissioner for a loan of $7500.00 in pursuance of the Act of Congress known as the Emergency Farm Mortgage Act of 1933. On January 29, 1934, the Land Bank and Land Commissioner approved a loan on the land in the amount of $4800.00 (same being 75 per cent of the appraised value of the land), and provided in the notice of approval the following conditions:

"(1) Indebtedness against this property not to exceed $4800 to show required equity," and "(2) when debts are required to

be reduced or released, the amount reduced or released must be permanently cancelled and not renewed after the loan is closed." In the meantime Cozart had concluded that he would rather purchase a different section of the Dawson County lands covered by the agency contract between Briley and the bank, and he (Cozart) had applied to Briley to be released of his contract to purchase Section 3. Briley told him that if a buyer for Section 3 was found who would agree to carry out Cozart's obligations to the bank, he, Cozart, would be released from the contract of sale which he had made with the bank. Shortly after this conversation occurred, Briley opened negotiations with Oldham for the sale to him of said Section 3. On January 27, 1934, these negotiations resulted in the execution of a written contract of sale between the bank and Oldham, respecting Section 3. The terms of sale provided in the contract are as follows:

"The purchase price being $9600, payable as follows: $1280 cash, the receipt of which is hereby acknowledged, and the said G. D. Oldham further agrees to execute nine vendor's lien notes each for $480.00, due on or before one, two, three, four, five, six, seven, eight and nine years from date, payable to the order of the Citizens National Bank of Abilene, reserving a vendor's lien on the above described land. The said G. D. Oldham agrees at his own expense to secure a loan of $4000, or less, if approved by the seller, on the above described land, the proceeds of said loan being to take up $4000 of the vendor's lien notes above described, the $4000 to be the last of the notes above described. The tenth note to be for the sum of $4000. * * *."

At the time this contract was signed Briley told Oldham of the Cozart contract. In respect to this, Oldham testified: "Well, all he told me was that they had sold the place to Cozart and that Cozart was unable to go on with it, and that Cozart had made an application for a loan through the Federal Land Bank, and that it would save the expense of another application if I would allow it to go on through in his name, and just allow Cozart to deed the place to me, rather than for him to deed it back to the bank and then the bank deed it to me. He said he would expect me to bear the expense of the application which would be $33.00 and the two of them would be $66.00. Naturally I wanted to save the money. I had this verbal understanding with Mr. Briley. I did not know anything about the Cozart notes that he had made to them. He didn't tell me what kind of deal they had made. He just said they had sold the place to Cozart and he didn't want it and wasn't able to go on with it

and was out of it. As far as I knew, I was just buying the place directly from the bank. I didn't know Cozart at all." Briley's version of the oral agreement of Oldham is to the effect that the latter agreed to carry out, to the satisfaction of the bank, the terms of Cozart's contract with the Abilene bank, upon the conclusion of the pending loan transaction between Cozart and the Land Bank.

Immediately after the contract of sale was made between the Abilene bank and Oldham, the latter was given possession of Section 3 and he has had possession thereof ever since.

As already stated, the Federal Land Bank and Land Commissioner approved the Cozart loan, for the amount of $4800, on January 29, 1934, and in regular course the documents required to conclude the transaction were duly executed by Cozart and the bank. These documents included a written assignment by the Abilene bank to the Land Bank and the Land Bank Commissioner whereby the Abilene Bank (quoting) "in consideration of the sum of $4640 in hand paid by the Federal Land Bank of Houston and the Land Bank Commissioner, acting under part 3 of the Emergency Farm Mortgage Act of 1933, the receipt of which is hereby acknowledged, has this day bargained, sold and conveyed and by these presents do bargain, sell, convey and assign, without recourse, unto said Bank and Land Commissioner, an unpaid balance of $4640, principal and interest, owing on those ten certain vendor's lien notes" (Describing the ten Cozart notes of date November 27, 1933). In connection with this assignment, the Abilene Bank delivered all said ten notes to the Land Bank and Land Commissioner, all of which notes were marked by the Abilene bank as "paid," and the bank understood that no part of the indebtedness represented by said notes was to be renewed. Cozart executed a deed of trust giving the Land Bank and Land Commissioner a first lien to secure the loan of $4800.00 After this loan transaction was concluded, Cozart, on May 10, 1934, deeded Section 3 to Oldham, as we have heretofore shown, and the latter executed to the Abilene bank the nine vendor's lien notes and the deed of trust in controversy.

■■ Counsel for Oldham contends that, as a consequence of the action of the Abilene bank in assigning to the Land Bank and Land Commissioner the ten Cozart vendor's lien notes, and declaring them paid, a subsequent renewal of any part of the indebtedness represented by said notes, and undertaking to secure same by a second lien on Section 3, would violate the purpose and policy of the Emergency Farm Mortgage Act of 1933, and therefore would be illegal. That this contention is

sound, we readily concede; but with this conceded, the validity of the nine vendor's lien notes in controversy in this case remains to be decided. Nothing is found in the Farm Mortgage Act which implies an attempt, on the part of Congress, to impose any restraint on the alienation of property mortgaged to the Land Bank and the Land Commissioner in conformity to the provisions of the act. Upon consummation of the loan to Cozart, he, Cozart, became vested absolutely with title to Section 3, free of all claims of the Abilene bank. As owner of said land, he had the right to convey same,—subject, of course, to the mortgage of the Land Bank and Land Commissioner,—to whomsoever he pleased. In the exercise of this right he conveyed said land to Oldham for a consideration which included the execution by Oldham of the nine vendor's lien notes in controversy. The promise of Oldham to pay said notes is founded on a valid consideration; therefore the notes and the lien securing same are valid. The motive of Cozart in requiring said notes to be made payable to the Abilene bank is immaterial to a decision in this case. The question of whether or not the said bank held a valid claim against Cozart is likewise immaterial. The legal status of Oldham's obligation to pay the nine vendor's lien notes in controversy is not materially different from that of a vendee who, as part of the consideration for the land which he purchases, promises to pay a usurious debt of his vendor. It is settled law, that in a case of that sort the promise of the vendee is valid. Irrespective of the vice of illegality which affects the assumed debt, he is bound by his promise to pay it as part of the consideration for the land which he acquires. National Bond & Mortgage Co. v. Mahaney, 124 Texas 544; 42 Texas Jur. p. 995.

For the reasons shown, the trial court did not err in instructing the jury to return a verdict in favor of Briley. The judgment of the Court of Civil Appeals is therefore reversed and the judgment of the trial court is affirmed.

Opinion adopted by the Supreme Court February 15, 1939.

Rehearing overruled March 15, 1939.